Njugana v. Ashcroft Dwayne Hamilton, Chow and Hamilton, representing Martin Njuguna, the petitioner. May it please the Court, Honorable Judges, Counsel, I believe that the true, undisputed facts of this case are links in a chain which, when connected, will compel this Court to find that my client has established his well-founded fear of persecution based upon political opinion. First of all, Your Honor, let's deal with the political aspect or category of this case. I believe it is clear here that there is a presumption of political opinion. The case Hernandez-Ortiz v. INS held that where there is no legitimate prosecutorial purpose for government action against a person, there arises a presumption of a political motivation. I think we have that in this case. I think if you look at the case and you look at the charges that were made against my client, and being mindful that the charge that the CIB made was not just against the father, it was against my client also, that he was engaged in a plot to defame and humiliate the government of Kenya overseas. This cannot be a legitimate prosecutorial purpose. What did my client do? My client engaged in an intervention on behalf of two hapless maids who were terribly mistreated by the Saudi royal family and placed in that precarious situation by a corrupt minister of the Kenyan government. What else did he do? He exercised his right to engage in political speech with his Kalenjin roommate, which ended in acrimony. This acrimony was political acrimony, but there is no law that my client broke, and there is no basis, no legal basis for a charge of defaming and humiliating the Kenyan government. Nevertheless, this is what the charge was. Your Honors, even in the absence of a presumption in this claim, I believe that you will find that the case falls within the area of political opinion. You need only ask yourself three questions. Who are the persecutors? What do they believe? Why do they believe it? I believe there are two classes of persecutor in this case. There's the persecutor that I call the catalyst persecutor. This is the guy that sets the engine of persecution in motion. He doesn't get his hands dirty. In this case, the catalyst persecutors are the corrupt minister Biwat and the Kalenjin roommate who returned to Kenya vowing that he would take revenge against my client. The actual persecutors in this case are the Kenyan CID and perhaps political thugs known as the Youth Wingers. What do they believe? The record is clear that they believe that my client embarrassed and humiliated the Kenyan government overseas, a political charge. Why do they believe it? Your Honors, the record is equally clear. They believe it because that's what they were told. We will see from this record that both Sam Tuyat, the son of a powerful Kenyan magistrate, and Nicholas Biwat, perhaps the most corrupt political figure in Kenyan history, both had the means and the motive to set this engine of persecution in motion against my client. Whether the claim arose out of a contractual dispute or whether it was personal animus between individuals is not relevant to this claim. It is not relevant to this claim because of the mixed motive analysis which must be applied to the case. Cases such as Singh v. all stand for the notion that when categorizing an asylum claim, where a motivation which falls within one of the five enumerated categories of asylum arises, the analysis with respect to categorization is over. The court is constrained to go in the direction of the motive which manifests itself. Counsel's claim that perhaps the court might come to two differing opinions on this is without merit. The court cannot say, well, we have a possible contractual motive and a possible political motive, so we'll select the contractual motive. The political motive is manifest, Your Honors, and I would urge you to categorize the case as it should be under the proper mixed motive analysis. Your Honors, with respect to the Board of Immigration Appeals decision, the Board of Immigration Appeals has failed us all in this case. They have failed us by abdicating their duty to give a reasoned decision in this case. The Supreme Court in Bowen v. American Hospital Association said it is an axiom of administrative law that an administrative agency in its decision making give a reasoned decision. In the immigration context, Velarde v. INS, Vargas v. INS, all state that the Board of Immigration Appeals, when issuing this type of a decision, must give a reasoned explanation based upon legitimate concerns. Let's assess the claim. The heart of the claim, the substance of the claim, was a future persecution asylum claim. What did the Board give us? The Board gave us a dance around the periphery of the case, addressing with some justifications the concept of past persecution and the remand issue. But at the heart of the claim, the future persecution, what did they give us? They gave us an unwarranted, conclusory, non sequitur about implausible, unsupported speculation. A future persecution asylum claim must inherently be speculative to some extent. We are talking about what will happen to a person in the future. The question is, was this speculative? Your Honor, in this context, where pursuant to Maldonado, Cruz, and cases like Artiga, Tercios, where the petitioner has been taken as credible and therefore his testimony true, let us just look at the record and work your way backwards, Your Honor, from the accusation which was made by the CID against my client, to Sam Tuyas' return to Kenya, to the bitter political acrimony and racial acrimony between him and the son of a powerful Kenyan magistrate, to the near international incident which almost transpired between the Saudi royal family, the Kenyan government, and the United States press over the treatment of the maids and the placement of the maids with the Saudi royal family. Your Honors, clearly, clearly, there was testimony in this case from the maid Eunice Yanyu, who has been granted asylum based on the same accusations, a plot to humiliate and defame the government of Kenya. The maid who procured the other maids has similarly been granted asylum, and it's in the record on that same allegation. Your Honor, we are asking that you perform a review of the record similar to the review that was done in Gowdy v. INS. Judge Fletcher, that was your case. No, I think it was my son's case. Your son's case. I beg your pardon, Judge. In Gowdy v. INS, the issue of plausibility was raised. The case was a little bit different from this case because a negative credibility finding had been made in that case, but nevertheless, the issue of plausibility came up. And Judge Fletcher, what you did was you broke down the circumstantial aspects of that case, and you looked step by step by step. Is this plausible? Could this be plausible? Could that be plausible? And you reversed the board, and we're asking that you do that. Well, you're asking for us to do exactly what? Because the way I see it, if we were to agree with you, that the issue of whether the government had introduced changed country conditions to rebut the well-founded fear hasn't been reached by the I.J. It really has not, Your Honor. And I think what we saw in this case, we had a United States Department of State report which was released, I believe, in January of 1998. Was that? That's part of the story. And that is part of the record. And I believe that that particular Department of State report was very much supportive of this asylum claim. If you look at the report, the report was saying that conditions had improved somewhat from the year before. Now, if you look at the year before, which is also part of the record, by the way, the Department of State report which was released in 1997, the conditions were atrocious in that country with regard to human rights. And just because the subsequent Department of State report said, well, the conditions have improved somewhat, the judge said, well, I don't see the fear. Your Honor, if you review that Department of State report, you will see. The one that the judge said, oh, well, the conditions have improved so much, you will see extrajudicial killings. You will see the government of Kenya using colonial-era laws to limit free expression. You will see that report. Further, Your Honors, if you look at the Amnesty International report, which covered a period subsequent to the Department of State report, you will see a deterioration. And that is also part of the record in the political conditions in Kenya. The only question I have is just refresh me or show me where maybe, since you've gone over your time after the government makes its argument, did the IJA reach that issue? Yes, Your Honor. I can get it really quickly here. Oh, I see. It's at page 14. All right. You found it faster than me, Your Honor. Right. I knew we've had a number of these cases this week, so. Yes. Okay, thank you. You've exceeded your time. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. My name is Allyson Drucker. I'm representing the United States. Petitioner's asylum claim is very attenuated. It's largely based on referring two friends to his attorney. In this case, the Board entered a de novo decision based on the record evidence. It found that the petitioner had not carried his burden of proof on well-founded fear for two reasons. One, that his reasons for fear were, quote, and two, that the problems he cited did not arise from a ground enumerated in the act. The Board also denied his self-styled motion to remand as, quote, Counsel, something that's quite concerning in this case is the IJ's saying that all of this is incredible. Certainly, there's been a great deal of publicity about abuse of foreign maids in Saudi Arabia. And the IJ seems to say this isn't possible. My understanding is that the immigration judge did not find this to be incredible, that there is not an adverse credibility finding in this case. But I would also say that just because someone is found to be credible, that does not mean that they are found to be persuasive. And I would also like to make the additional point that here all the things have happened. If credibility isn't challenged and therefore assumed that is correct, there are an awful lot of things happened that would certainly cause someone to fear persecution if he went back. Well, in our view, the credibility just goes to the person's truthfulness, but not necessarily his accuracy in drawing implications from what he is, the statements that he's making that are truthful. And we would point out that there's many aspects of his account which are speculative, and I'd be happy to have an opportunity to go through and enumerate those for you, if I might. When I said incredible, what I really meant, he said that these things were fanciful, that they couldn't possibly be true, not necessarily that the Petitioner didn't believe them, but that they were just too fanciful. Well, Your Honor, in any case, our position is that the Board entered a de novo decision here, and that it isn't – and so that the decision of the immigration judge, even if it should be flawed, is not what the Board – excuse me, is not what this Court is reviewing. The Board decision agreed – it specifically says that it agrees with the ultimate conclusion of the immigration judge, but it does not say that it adopts the – that decision, and indeed, I don't believe that it did. Well, this – okay, let's talk about the V.I.A. decision then. It's – it agrees that the immigration judge found that Nguyen was credible. And it cites a case, LADA, that says that after that, you don't need any additional corroboration. But despite saying his testimony is credible, and despite the testimony talking about past persecution, it goes on to say there is no evidence of past persecution. How do you explain that? I'm sorry. I don't think there is evidence of past persecution. There's certainly evidence of past persecution of his family. Well, not of the individual. I think that's what the Board was saying. I mean, that – And there were threats made against him, weren't there? And wasn't he warned that if he came back, there would be consequences because he had made negative statements about the Kenyan government? Actually, that's – that's one of the speculative aspects in this case. At the point where passports were returned to the two maids, I believe the man who was returning the passports made some statement to the three people who were present that there would be consequences for you. However, the three people were the two maids and an attorney. Petitioner was not even present on that occasion. So it's totally speculative that that remark extended to him. Other examples of speculative aspects in this case are Petitioner's – Well, why wouldn't that pertain to him? He's the one that got them to issue the passports and take them back to – Well, no. Actually, actually, I don't think that's quite accurate. He was a friend of these – of the two maids. Yes. And they requested his help, and he put them in touch with his attorney. And his attorney got – The attorney was the one who took these, you know, more, what, flamboyant steps and actions. So the consequences would only be against the attorney in the United States. Is that what you're saying? Well, it's just – When he said all of you, there would be consequences for all of you. So it's really unclear. It seems that's hard to – You know, the immigrant – maybe I just can't separate out because the BIA does rely on the statements of speculation and so-called implausibility that the IJ talks about, obviously. And the IJ's opinion seems to just have inherent disbelief that the two Saudi maids may have been essentially slaves, that they planned their escape from this forced so-called employment a year in advance, contacted their friend, and made the arrangements to escape. The IJ keeps calling this a employment at will. That seems to be just disregarding the whole reality of what's going on in these countries. Again, with all respect, our position is that the IJ decision is not what should be reviewed by the Court, just the Board decision. And I think that the Board's decision was adequately supported in the record. The Board doesn't explain any of this. The Board says he's credible, and then it leaps to no evidence of past persecution. Then it leaps to the Respondent relies upon unsupported and implausible speculation when he would suffer persecution on account of a protected ground. I would say that's – Excuse me. I just want to get to the final point of this. And that's clearly with reference to what the IJ found. And then it leaps to the motion to reopen. It doesn't talk about the evidence at all. It talks about the additional material that was submitted in connection with the motion to reopen. There is no reasoning in this opinion. In our view, the Board states the Respondent also relies entirely upon unsupported and implausible speculation when asserting that he would suffer persecution on account of a protected ground in Kenya. Now, I admit that is not lengthy. But there is, you know, not a bright-line test in this area for what a Board decision needs to set forth. And we believe it's a sufficient point of view. To give it any meaning at all, you have to read it in conjunction with what the IJ found. Well, you certainly have to read it in conjunction with something. I guess the record is what we would say, yes. Right, right. And what the IJ found is the record as is. Well, I assume the record as is everything else. But, again, this Board decision is not adopting the IJ decision. I'm sorry. Doesn't the record show that the family was ousted from its farms, that people in his family lost jobs, and there was no other reason given for why that all happened, just all of a sudden because of his action? Well, that is the inference that he draws. That is not the only inference that can be drawn from the record in our view. What inference could be drawn as to what happened to the family that didn't relate to the son's activity? Petitioner has the burden of proof in this case. No, I'm asking you, what inference could be drawn other than that it was the conduct of the son that caused these things to happen? That these things are totally unrelated, that they're caused by either other actions of the family members or just, you know, general conditions in Kenya. All right. Thank you, counsel. The case of Naguna v. Ashcroft will be submitted. The matter of Lazovic v. Ashcroft has been submitted on the briefs, and we will take up U.S. Day.
judges: Hug, B. Fletcher, Wardlaw